UNITED STATES DISTRICT COURT



DISTRICT OF CONNECTICUT

| | |
|---|---|
| PETER DERRER, Derivatively on Behalf of TEREX CORPORATION, <br><br> Plaintiff, <br><br> vs. <br><br> RONALD M. DEFEO, PHILLIP C. WIDMAN, THOMAS J. RIORDAN, G. CHRIS ANDERSEN, DONALD P. JACOBS, DAVID A. SACHS, WILLIAM H. FIKE, DONALD DEFOSSET, HELGE H. WEHMEIER, PAULA H. J. CHOLMONDELEY, OREN G. SHAFFER, THOMAS J. HANSEN, and DAVID C. WANG, <br><br> Defendants, <br><br> and <br><br> TEREX CORPORATION, a Delaware corporation, <br><br> Nominal Defendant. | Case No.    2010 APR 12 P 12: 05 <br> 3:10CV550(CFD) <br> VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934, BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT <br><br><br><br><br><br><br><br><br><br><br> <u>DEMAND FOR JURY TRIAL</u> |

Plaintiff, by his attorneys, submits this Verified Shareholder Derivative Complaint ("Complaint") against the defendants named herein.

## NATURE AND SUMMARY OF THE ACTION

1.     This is a shareholder derivative action brought by a shareholder of Terex Corporation ("Terex" or the "Company") on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of law, including violations of §10(b) and §20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 as promulgated thereunder, breaches of fiduciary duties, waste of corporate assets, and unjust enrichment that have caused substantial monetary losses to Terex and other damages, such as to its reputation and goodwill.

2.    Terex is a diversified global manufacturer of capital equipment for the construction, infrastructure, quarrying, surface mining, shipping, transportation, power, and energy industries. Terex operates in five segments: (i) Terex Aerial Work Platforms; (ii) Terex Construction; (iii) Terex Cranes; (iv) Terex Materials Processing & Mining; and (v) Terex Roadbuilding, Utility Products and Other.

3.    During 2008, Terex's business faced an undisclosed material risk represented by declining demand for the Company's products due to the economic downturn. This economic downturn, which was widely predicted by economists, took effect in December 2007. Defendants sought to conceal Terex's exposure to the downturn by making and authorizing Terex to make false and misleading statements and authorizing and repurchasing the Company's stock at artificially inflated levels. The false and misleading statements and stock repurchase misled the Company's shareholders into believing that the Company's diverse businesses would insulate it from the economic downturn.

4.    Indeed, beginning in February 2008 and continuing to February 2009, defendants falsely assured Terex's shareholders that "while news headlines continue to broadcast slowing economic conditions in North America and Western Europe, we remain optimistic about prospects for our businesses in both of these markets and continue to see very healthy indicators for continued economic expansion." On the surface, defendants' statements appeared to have merit because between February 2008 and April 2008, the Company was on its way to meeting its earnings guidance for the year and even raised its guidance on April 23, 2008. Defendants continued their deception by stating "all is not doom and gloom in our markets and I hope you get that sense from our press release" and that they "believe we're reasonably well-positioned for the current economic environments."

5.    The defendants knew, however, that Terex was not insulated from the economic downturn. The Company was subject to the risk that customers would stop making, cancel, and defer orders, providing the Company without any sales to meet its self imposed and lofty earnings guidance. Beginning in August 2008, the truth regarding the Company's business prospects started

to trickle out when the Company lowered its earnings guidance and ceased repurchasing its artificially inflated shares. The Company would continue to lower its earnings guidance on three more occasions throughout 2008 and into 2009, until eventually deciding to stop providing earnings guidance altogether.

6.     In December 2007, the Company's Board of Directors ("Board") authorized a repurchase of $500 million to repurchase the Company's stock. Defendants then used this repurchase to perpetuate the false impression that the Company's business prospects were good. The repurchase forced the Company to waste its assets to repurchase its stock while at artificially inflated levels because of the misleading statements. Indeed, the defendants not only continued to force Terex to repurchase its own stock, but actually authorized an additional $500 million repurchase on July 15, 2008. From February 2008 through August 2008, the Company spent more than $391 million repurchasing its own artificially inflated stock at prices as high as $71.88 per share.

7.     When the truth about the Company's business prospects were disclosed, Terex market capitalization was devastated, declining by over $6.6 billion, or 87%, from its high of $7.5 billion on May 6, 2008, the highest price during the time of the false and misleading statements and misleading repurchase that inflated the Company's stock price.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction in this case arising under Article III of the United States Constitution and 28 U.S.C. §1331 because of claims arising under the Exchange Act.

9.     This Court also has jurisdiction over all causes of action asserted herein pursuant to 28 U.S.C. §1332 in that plaintiff is not a citizen of the United States and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

10. This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

11. Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) Terex maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Terex, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

### THE PARTIES

12. Plaintiff Peter Derrer was a shareholder of Terex at the time of the continuing wrong complained of. The continuing wrong included the issuance of false and misleading statements regarding Terex's earnings guidance and business prospects, as well as the improper repurchases of Terex's shares, which artificially inflated Terex's stock price during February 2008 through February 2009. Once plaintiff became a shareholder, he has continuously been a shareholder. Plaintiff is a citizen of Switzerland.

13. Nominal defendant Terex is a Delaware corporation with its principal executive offices located at 200 Nyala Farm Road, Westport, Connecticut. Terex is a global manufacturer of capital equipment for the construction, infrastructure, quarrying, surface mining, shipping, transportation, power, and energy industries.

14. Defendant Ronald M. DeFeo ("DeFeo") is Terex's Chief Executive Officer ("CEO") and has been since March 1995. DeFeo is also Terex's Chairman of the Board and has been since March 1998 and a director and has been since 1993. DeFeo was Terex's President and Chief Operating Officer ("COO") from October 1993 to January 2007. DeFeo joined Terex in May 1992.

Defendant DeFeo knowingly or recklessly made false statements regarding Terex's earnings guidance and business prospects. Defendant DeFeo also authorized the repurchase of shares and failed to halt the repurchase of shares while Terex's share price was artificially inflated as a result of the false and misleading statements regarding Terex's earnings guidance and business prospects. Terex paid defendant DeFeo the following compensation:

| Fiscal Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Compensation | Increase in Pension Value | All Other Compensation |
|---|---|---|---|---|---|---|---|
| 2008 | $1,150,000 | - | $8,460,358 | - | - | $1,374,573 | $809,827 |
| 2007 | $1,025,000 | $110,000 | $10,596,912 | $166,200 | $2,397,713 | $1,585,928 | $313,733 |

Defendant DeFeo is a citizen of Connecticut.

15.     Defendant Phillip C. Widman ("Widman") is Terex's Senior Vice President and Chief Financial Officer ("CFO") and has been since September 2002. Defendant Widman knowingly or recklessly made false statements regarding Terex's earnings guidance and business prospects. Terex paid defendant Widman the following compensation:

| Fiscal Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Compensation | Increase in Pension Value | All Other Compensation |
|---|---|---|---|---|---|---|---|
| 2008 | $526,250 | - | $1,825,197 | $54,352 | $336,368 | $142,353 | $90,683 |
| 2007 | $500,000 | $100,000 | $1,960,078 | $80,807 | $431,288 | $154,329 | $76,928 |

Defendant Widman is a citizen of Connecticut.

16.     Defendant Thomas J. Riordan ("Riordan") is Terex's President and COO and has been since January 2007. Defendant Riordan knowingly or recklessly made false statements regarding Terex's earnings guidance and business prospects. Terex paid defendant Riordan the following compensation:

| Fiscal Year | Salary | Stock Awards | Non-Equity Incentive Compensation | Increase in Pension Value | All Other Compensation |
|---|---|---|---|---|---|
| 2008 | $780,000 | $1,854,084 | $664,739 | $165,759 | $250,251 |
| 2007 | $744,231 | $1,754,686 | $857,849 | $93,595 | $269,177 |

Defendant Riordan is a citizen of Connecticut.

17.    Defendant G. Chris Andersen ("Andersen") is Terex's Lead Director and has been since 2006 and a director and has been since 1992. Defendant Andersen authorized the repurchase of shares and failed to halt the repurchase of shares while Terex's share price was artificially inflated as a result of the false and misleading statements regarding Terex's earnings guidance and business prospects. Defendant Anderson sold 20,000 of his personally held shares for $1,310,600 in proceeds while in possession of material, non-public information. Terex paid defendant Andersen the following compensation:

| Fiscal Year | Fees Earned | Options Awards | Total |
|---|---|---|---|
| 2008 | $43,000 | $129,609 | $172,609 |

Defendant Anderson is a citizen of New York.

18.    Defendant Donald P. Jacobs ("Jacobs") is a Terex director and has been since 1998. Jacobs is also a member of Terex's Audit Committee and has been since at least 2007. Defendant Jacobs knowingly or recklessly reviewed and approved the false and misleading statements regarding Terex's earnings guidance and business prospects. Defendant Jacobs also authorized the repurchase of shares and failed to halt the repurchase of shares while Terex's share price was artificially inflated as a result of the false and misleading statements regarding Terex's earnings guidance and business prospects. Defendant Jacobs sold 10,000 of his personally held shares for $670,100 in proceeds while in possession of material, non-public information Terex paid defendant Jacobs the following compensation:

| Fiscal Year | Fees Earned | Total |
|---|---|---|
| 2008 | $158,000 | $158,000 |

Defendant Jacobs is a citizen of Illinois.

19.    Defendant David A. Sachs ("Sachs") is a Terex director and has been since 1992. Sachs was also a member of Terex's Audit Committee from at least 2007 to at least April 2008. Defendant Sachs knowingly or recklessly reviewed and approved the false and misleading statements regarding Terex's earnings guidance and business prospects. Defendant Sachs also authorized the repurchase of shares and failed to halt the repurchase of shares while Terex's share

price was artificially inflated as a result of the false and misleading statements regarding Terex's earnings guidance and business prospects. Terex paid defendant Sachs the following compensation:

| Fiscal Year | Fees Earned | Stock Awards | Total |
|---|---|---|---|
| 2008 | $60,019 | $120,000 | $180,019 |

Defendant Sachs is a citizen of California.

20.    Defendant William H. Fike ("Fike") is a Terex director and has been since 1995. Fike was also Terex's Lead Director from at least April 2003 to at least May 2006. Defendant Fike knowingly or recklessly authorized the repurchase of shares and failed to halt the repurchase of shares while Terex's share price was artificially inflated as a result of false and misleading statements regarding Terex's earnings guidance and business prospects. Terex paid defendant Fike the following compensation:

| Fiscal Year | Fees Earned | Stock Awards | Options Awards | Total |
|---|---|---|---|---|
| 2008 | $6,000 | $75,000 | $64,804 | $145,804 |

Defendant Fike is a citizen of Florida.

21.    Defendant Donald DeFosset ("DeFosset") is a Terex director and has been since 1999. DeFosset is also Chairman of Terex's Audit Committee and has been since at least 2007. Defendant DeFosset knowingly or recklessly reviewed and approved the false and misleading statements regarding Terex's earnings guidance and business prospects. Defendant DeFosset also authorized the repurchase of shares and failed to halt the repurchase of shares while Terex's share price was artificially inflated as a result of the false and misleading statements regarding Terex's earnings guidance and business prospects. Terex paid defendant DeFosset the following compensation:

| Fiscal Year | Fees Earned | Stock Awards | Options Awards | Total |
|---|---|---|---|---|
| 2008 | $38,000 | $75,000 | $64,804 | $177,804 |

Defendant DeFosset is a citizen of Florida.

22.    Defendant Helge H. Wehmeier ("Wehmeier") is a Terex director and has been since 2002. Wehmeier is also a member of Terex's Audit Committee and has been since at least 2007. Wehmeier announced in February 2010 that he will not stand for re-election as a Terex director at

the annual meeting scheduled for May 2010. Wehmeier will continue to serve the remainder of his term until its expiration in May 2010. Defendant Wehmeier knowingly or recklessly reviewed and approved the false and misleading statements regarding Terex's earnings guidance and business prospects. Defendant Wehmeier also authorized the repurchase of shares and failed to halt the repurchase of shares while Terex's share price was artificially inflated as a result of the false and misleading statements regarding Terex's earnings guidance and business prospects. Terex paid defendant Wehmeier the following compensation:

| Fiscal Year | Fees Earned | Total |
|---|---|---|
| 2008 | $158,000 | $158,000 |

Defendant Wehmeier is a citizen of Pennsylvania.

23.     Defendant Paula H. J. Cholmondeley ("Cholmondeley") is a Terex director and has been since 2004. Cholmondeley was also a member of Terex's Audit Committee from at least 2007 to at least April 2008. Defendant Cholmondeley knowingly or recklessly reviewed and approved the false and misleading statements regarding Terex's earnings guidance and business prospects. Defendant Cholmondeley also authorized the repurchase of shares and failed to halt the repurchase of shares while Terex's share price was artificially inflated as a result of the false and misleading statements regarding Terex's earnings guidance and business prospects. Terex paid defendant Cholmondeley the following compensation:

| Fiscal Year | Fees Earned | Total |
|---|---|---|
| 2008 | $161,238 | $161,238 |

Defendant Cholmondeley is a citizen of Massachusetts.

24.     Defendant Oren G. Shaffer ("Shaffer") is a Terex director and has been since 2007. Shaffer is also a member of Terex's Audit Committee and has been since March 2007. Defendant Shaffer knowingly or recklessly reviewed and approved the false and misleading statements regarding Terex's earnings guidance and business prospects. Defendant Shaffer also authorized the repurchase of shares and failed to halt the repurchase of shares while Terex's share price was artificially inflated as a result of the false and misleading statements regarding Terex's earnings guidance and business prospects. Terex paid defendant Shaffer the following compensation:

- 8 -

| Fiscal Year | Fees Earned | Stock Awards | Total |
|---|---|---|---|
| 2008 | $8,000 | $150,000 | $158,000 |

Defendant Shaffer is a citizen of Colorado.

25.     Defendant Thomas J. Hansen ("Hansen") is a Terex director and has been since May 2008. Hansen is also a member of Terex's Audit Committee and has been since at least March 2009. Defendant Hansen knowingly or recklessly authorized the repurchase of shares and failed to halt the repurchase of shares while Terex's share price was artificially inflated as a result of false and misleading statements regarding Terex's earnings guidance and business prospects. Terex paid defendant Hansen the following compensation:

| Fiscal Year | Fees Earned | Stock Awards | Total |
|---|---|---|---|
| 2008 | $49,063 | $72,337 | $121,400 |

Defendant Hansen is a citizen of Illinois.

26.     Defendant David C. Wang ("Wang") is a Terex director and has been since May 2008. Defendant Wang knowingly or recklessly authorized the repurchase of shares and failed to halt the repurchase of shares while Terex's share price was artificially inflated as a result of false and misleading statements regarding Terex's earnings guidance and business prospects. Terex paid defendant Wang the following compensation:

| Fiscal Year | Fees Earned | Stock Awards | Total |
|---|---|---|---|
| 2008 | $1,295 | $119,673 | $120,968 |

Defendant Wang is a citizen of China and/or Washington.

27.     The defendants listed in ¶¶14-16 are collectively referred to herein as the "Officer Defendants".

28.     The defendants listed in ¶¶14, 17-26 are collectively referred to herein as the "Director Defendants."

29.     The defendants listed ¶¶18-19, 21-25 are collectively referred to herein as the "Audit Committee Defendants."

30.     The Officer Defendants and the Director Defendants are collectively referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

31.     By reason of their positions as officers, directors, and/or fiduciaries of Terex and because of their ability to control the business and corporate affairs of Terex, the Individual Defendants owed Terex and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Terex in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Terex and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

32.     Each director and officer of the Company owes to Terex and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

33.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Terex, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial, and directorial positions with Terex, each of the Individual Defendants had access to adverse non-public information about the Company's earnings guidance, business prospects, and improper representations of Terex.

34.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Terex, and was at all times acting within the course and scope of such agency.

35.     To discharge their duties, the officers and directors of Terex were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the

financial affairs of the Company. By virtue of such duties, the officers and directors of Terex were required to, among other things:

(a)     refrain from acting upon material inside corporate information to benefit themselves;

(b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(c)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to avoid wasting the Company's assets and to maximize the value of the Company's stock;

(d)     properly and accurately guide investors and analysts as to the true condition of the Company at any given time, including making accurate statements about the Company's business prospects and results and ensuring that the Company maintained an adequate system of internal controls such that the Company's reporting would be true and accurate at all times;

(e)     remain informed as to how Terex conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(f)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

36.     The Company's Audit Committee also owed specific duties under the Audit Committee Charter.[1] The Audit Committee's Charter required that the Audit Committee monitor "quality and integrity of the accounting, auditing, and reporting practices of the Company." The

---

[1] The Audit Committee Charter quoted in this Complaint was ratified on May 13, 2009, but the Audit Committee Charter has been substantially similar since the beginning of the wrongdoing alleged.

Audit Committee was required to review and approve all earnings press releases and other disclosures. During 2008, the Audit Committee met thirteen times. The Audit Committee Charter stated:

> **Committee Responsibilities**
> In meeting its responsibilities, the Committee shall, without limitation, take the following actions:
>
> 1. Monitor the Company's financial reporting process (including the system of internal control) and the objectivity of the Company's internal and independent auditors.
>
>          * * *
>
> 9. Review and discuss with management and the independent auditor at the completion of each quarterly examination and prior to issuance of unaudited interim financial statements:
>
>          * * *
>
> 12. Review and discuss with management and the independent auditor earnings press releases and related financial information and earnings guidance.
>
> 13. Review and discuss with the independent auditor on a periodic basis:
>
>      a. Critical accounting policies and practices of the Company.

37.      Pursuant to their duty to review and discuss with management and the independent auditor "earnings press release and related financial information and *earnings guidance*," defendants Jacobs, Sachs, DeFosset, Wehmeier, Cholmondeley, and Shaffer were directly involved in approving the Company's earning guidance and reported backlog. The Audit Committee breached their duties as set forth in the Audit Committee Charter by reviewing and approving earnings press releases and guidance that were false and misleading.

38.      Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their

obligations as directors and officers of Terex, the absence of good faith on their part, and knowing or reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

39.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

40.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was issuing materially false and misleading earnings guidance and business prospects; (ii) enhance the Individual Defendants' executive and directorial positions at Terex and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions; and (iii) deceive the investing public, including its own shareholders, via false and misleading statements and a substantial stock repurchase, in which certain defendants sold their personally held stock, regarding the Individual Defendants' management of Terex's operations, the Company's health and stability, and its future business prospects. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

41.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## FALSE AND MISLEADING STATEMENTS

42.     According to Terex's Form 10-K, filed with the U.S. Securities and Exchange Commission ("SEC") on February 27, 2009, Terex "is a diversified global manufacturer of capital

equipment focused on delivering reliable, customer relevant solutions for the construction, infrastructure, quarrying, surface mining, shipping, transportation, power and energy industries." Terex operates in five segments: (i) Terex Aerial Work Platforms; (ii) Terex Construction; (iii) Terex Cranes; (iv) Terex Materials Processing & Mining; and (v) Terex Roadbuilding, Utility Products and Other. In February 2008, the Aerial Work Platforms accounted for approximately 22% of Terex's net sales; Construction accounted for approximately 21% of the Company's sales; Cranes accounted for approximately 25% of the Company's net sales; Material Processing & Mining accounted for approximately 25% of the Company's net sales; and Roadbuilding, Utility Products and Other accounted for 7% of the Company's net sales.

43.     Terex faced certain material risks to the earnings of its five segments, as evidenced by the specific disclosures in the Company's 2007 Form 10-K, filed on February 27, 2008. One of the material risks that the Form 10-K focused on was the risk of changing economic conditions and deferrals of orders due to weak economic conditions. In particular, the Form 10-K disclosed as follows:

**Our business is affected by the cyclical nature of the markets we serve.**

Demand for our products depends upon general economic conditions in the markets in which we compete. Our sales depend in part upon our customers' replacement or repair cycles. Adverse economic conditions, including a decrease in commodity prices, may cause customers to forego or postpone new purchases in favor of repairing existing machinery. Downward economic cycles may result in reductions in sales of our products, which may reduce our profits. We have taken a number of steps to reduce our fixed costs and diversify our operations to decrease the negative impact of these cycles. There can be no assurance, however, that these steps will prevent the negative impact of poor economic conditions.

\* \* \*

**Some of our customers rely on financing with third parties to purchase our products.**

We rely on sales of our products to generate cash from operations. A significant portion of our sales are financed by third party finance companies on behalf of our customers. The availability of financing by third parties is affected by general economic conditions, the credit worthiness of our customers and the estimated residual value of our equipment. Deterioration in the credit quality of our customers or the estimated residual value of our equipment could negatively impact

the ability of our customers to obtain the resources they need to make purchases of our equipment.

44. Defendants DeFeo, Widman, Andersen, Cholmondeley, DeFosset, Fike, Jacobs, Sachs, Shaffer, and Wehmeier signed the Company's 2008 Form 10-K. Thus, each of these defendants knew or was extremely reckless in not knowing about the material risks that the Company faced.

45. Defendants DeFeo, Widman, and Riordan's false and misleading statements, the stock repurchase authorization, and stock repurchases were designed to convince the public that these risks would not affect the Company. The economic downturn resulted in declining demand for Terex's products and eventually led to the cancellations and deferrals predicted in the above-mentioned fiscal 2008 Form 10-K. Nevertheless, in the false and misleading statements alleged below, Terex misled investors through its earnings guidance and business prospects into believing that the Company was insulated from the economic downturn and the threat from the cancellation and deferral of orders. Defendants DeFeo, Riordan, and Widman personally made many of these statements in earnings press releases and during earnings conference calls. The Audit Committee members reviewed and approved these statements.

46. The following false and misleading statements issued between February 2008 and February 2009 constituted a continuing wrong against the Company. These statements wrongfully suggested that Terex would meet its earnings guidance and that its business prospects were strong despite the economic downturn. This continuing wrong was not complete until February 2009 when defendant DeFeo disclosed that Terex would not be able to meet its own earnings guidance due to the cancellations and deferral of orders due to the economic recession.

47. As members of the Audit Committee, defendants Jacobs, Sachs, DeFosset, Wehmeier, Cholmondeley, and Shaffer were required to review and approve these statements and earnings guidance. Additionally, defendants DeFeo, Riordan, and Widman made statements in press releases and earnings conference calls that were false and misleading.

**False and Misleading Fourth Quarter 2007 Statements**

48.     On February 20, 2008, Terex issued an earnings press release announcing its results for its fiscal fourth quarter 2007 and full year 2007. In the press release, defendant DeFeo stated "2007 was a very strong year in terms of financial performance, with our best sales quarter of the year coming in the fourth quarter. This was a transformational year for our Company, as it demonstrated that the changes made as part of the journey we embarked on a few years back are taking hold and working." In the press release, defendant DeFeo went on to state that:

> We expect generally strong global markets to continue to drive demand for our equipment. Add to that our expectation that we will have the ability to produce at greater volumes and with improved productivity, and 2008 looks to be a significant step forward towards our corporate 2010 objective. *It is our expectation that Terex's total revenue for 2008 will be between $10.0 and $10.5 billion, and earnings per share in the range of $6.65 to $7.15 per share.... Expectations are for earnings in the first and second half of 2008 to be approximately equal. Additionally, we expect our first quarter results to be approximately 35% - 40% of our first half guidance.*

49.     Also in the press release was the Company's guidance for 2010, which was $12 billion in net sales and a $12 billion operating margin. The press release stated:

> Included in this release is our initial outlook for the 2008 fiscal year.... Reflecting on where we are today with respect to our objective of *$12 billion in sales and a 12% operating margin by 2010*, we feel we are ahead of our original timeline. And *while news headlines continue to broadcast slowing economic conditions in North America and Western Europe, we remain optimistic about prospects for our businesses in both of these markets and continue to see very healthy indicators for continued economic expansion from the developing markets, notably in Asia, Eastern Europe and the Middle East.*

50.     On February 21, 2008, defendants DeFeo, Widman, and Riordan, and non-defendants Richard Nichols ("Nichols"), President, Terex Cranes, Timothy A. Ford ("Ford"), President, Aerial Work Platforms, Robert G. Isaman ("Isaman"), President, Terex Construction, and Stoyan Filipov, President, Developing Markets and Strategic Accounts, held an earnings conference call. In the conference call, defendant DeFeo stated, "the sales downdraft from U.S. housing began in mid 2006 so we had a full year effect in 2007. We were able to offset the rather small exposure that we do have to the U.S. housing market to begin and continue to grow our business in markets where area work platforms and cranes and mining equipment are still relatively quite strong."

- 16 -

51.     The fourth quarter 2007 statements were false and misleading because defendants

DeFeo, Riordan, and Widman knowingly or recklessly provided earnings guidance that was not

achievable based on market conditions, despite their claim that it would not significantly impact

Terex. In particular, the Company's ability to meet its earnings was subject to substantial risks that

customers would cancel and defer orders, which the Individual Defendants denied would be an issue.

**False and Misleading First Quarter 2008 Statements**

52.     On April 23, 2008, Terex issued a press release announcing its first quarter fiscal

2008 financial results. Defendant DeFeo stated that the Company was "pleased with the first

quarter's results, with both net sales and net income growth posting solid double digit percentage

increases versus the prior year" and that "near term outlook is positive for the Construction Segment

.... *In general, we think that all of our operations continue to have solid prospects heading into*

*the remainder of the year*." Also in the press release, defendant Riordan, stated that the Company

"remain[s] confident about our business outlook for the remainder of 2008."

53.     In the press release, the Company raised its guidance. Defendant DeFeo stated "[i]n

February, we provided earnings guidance for our 2008 performance, indicating that we anticipated

earnings per share to be between $6.65 and $7.15 and net sales to be between $10.0 and $10.5

billion. Given our strong performance this quarter, balanced against the uncertainties surrounding

some of our end markets and increased output costs, *we now anticipate earnings per share for 2008*

*to be towards the middle to high end of our previously announced range, or $6.85 to $7.15 per*

*share, on net sales of $10.5 to $10.9 billion*."

54.     The press release cautioned that the Company's "Construction" segment slowdown

was "to be temporary and that the net result of this activity is still expected to yield significant

volume opportunity and cost reduction." The press release stated that the "Roadbuilding, Utility

Products and Other" segment activity "remains strong for both the asphalt plant and utility product

businesses and shipments are expected to increase in the second quarter." The press release stated:

> Construction: Net sales for the Construction segment for the first quarter of 2008
> increased $40.5 million, or 9.9%, to $448.3 million versus the first quarter of 2007.
> Excluding the translation effect of foreign currency exchange rate changes of $29.8

million and ASV sales since its acquisition of $21.3 million, net sales decreased approximately 2.6%. *The U.S. market remained relatively weak and the European market was moderately slower. This decline was mostly offset with positive developments in the Middle East and Eastern Europe.* Additionally, the larger construction-class off-highway truck business in Motherwell, Scotland experienced a slow-down in production rates due to challenges that arose during the shift to a mixed model production line. *This shortfall is expected to be temporary, and the net result of this activity is still expected to yield significant volume opportunity and cost reduction.*

55.  On April 24, 2008, Terex held an earnings conference call for its first quarter fiscal 2008 financial results. Defendants DeFeo, Widman, and Riordan, along with non-defendants Ford Nichols, and Isaman, conducted the conference call.

56.  In the conference call, defendant DeFeo again falsely reassured the public that the Company was in good shape even in a very difficult economy, stating "[a]ll is not doom and gloom in our markets and I hope you get that sense from our press release." Moreover, defendant DeFeo falsely stated that the Company would be able to reach its long term goal of $12 billion in net sales with a 12% operating margins in 2010. Defendant Widman stated that "[w]ith regard to backlog levels, we continue to experience significant overall growth. Up to $4.8 billion from $3.4 billion in the prior year. Again, this represents orders that are deliverable in the next 12 months." Defendant Widman reaffirmed the Company guidance stating that "[g]iven our strong first quarter performance, and assessment on the challenges and opportunities in some of our end markets, the anticipated steel cost pressures and our response to these factors, *we're increasing our full year 2008 guidance to a net sales level of [$]10.5 billion to $10.9 billion and earnings of $6.85 to $7.15 per share.*"

57.  Defendant Riordan stated on the conference call that "[t]he markets continue to be reasonably strong on average as most regions continue to improve their infrastructure which drives demand for our products....We believe we're reasonably well-positioned for the current economic environment." With regard to the Company's Roadbuilding segment, defendant Riordan stated that "[w]ith steel cost increases we're seeing and the competitive environment, we're likely to see very moderate *improvement of profitability this year.*" Remarking on the Company's Construction

segment, defendant Riordan stated that "our order rates are solid, our backlog is up significantly from a year ago and we expect good midterm performance from this group."

58.     On July 15, 2008, the Company issued a press release that announced that the Board authorized the Company to repurchase up to $500 million of its own stock. The Board members who approved the repurchase included defendants DeFeo, Andersen, Jacobs, Sachs, Fike, DeFosset, Wehmeier, Cholmondeley, Shaffer, Hansen, and Wang. In the press release, Defendant DeFeo stated:

> This action represents the second step-up in our share repurchase program since the program began. ***We continue to believe that investing in our shares provides an attractive return....*** Terex has the financial strength today to expand the share repurchase program without affecting our ability to implement internal or external initiatives. We remain optimistic about meeting our long-term goals, and are committed to enhancing shareholder value.

59.     In response to the repurchase announcement, the Company's stock rose $5.81 per share, or 14% to close at $48.47 and increased its market capitalization to $4.3 billion. The stock repurchase authorization was a further attempt by the Board to bolster the Company's artificially inflated stock price. The combination of the false and misleading statements, stock repurchase authorization, and subsequent stock repurchases at artificially inflated prices, improperly bolstered the stock price and misled the Company's investors.

60.     The first quarter 2008 statements were also false and misleading because the Individual Defendants knowingly or recklessly provided earnings guidance that was not achievable based on market conditions they claimed would not significantly impact Terex. The Company's ability to meet its earnings was also subject to substantial undisclosed risks that customers would cancel and defer orders.

**False and Misleading Second Quarter 2008 Statements**

61.     On July 23, 2008, Terex issued a press release announcing its second quarter fiscal 2008 financial results. Once again, defendant DeFeo heralded the Company's strength in a bad economy. Defendant DeFeo stated that the Company's results for the quarter "demonstrate the continued strength of our global franchise." Defendant DeFeo went on to state that:

*The infrastructure and commodity boom is driving strong demand for our cranes and mining equipment. Based on our increasing backlog for these products, we expect these positive trends to continue.* Also, as expected, this was partially offset by slower growth trends in the Aerial Work Platforms (AWP) segment and further softening in the Construction segment. Though both AWP and Construction experienced growth this past quarter, slower growth in Western Europe impacted their performance.

* * *

The power of our strategy of product and geographic diversity is illustrated in our results.... *We have been able to continue to grow net sales and income through an evolving sales mix.* The Cranes and Materials Processing & Mining (MPM) segments grew dramatically during the period. Geographically, we continue to see significant growth in developing markets in line with global infrastructure development. Over time, our percentage of sales to developing markets has steadily increased, with first half 2008 net sales in these regions representing approximately 22% of our total sales.

62.     In the press release, defendant DeFeo also reaffirmed the increased earnings guidance provided on April 23, 2008. Defendant DeFeo stated:

> *We expect our performance for 2008 to be within our previously announced range for earnings per share of $6.85 to $7.15 and net sales of $10.5 to $10.9 billion.* We expect strong infrastructure and commodity demand trends for our Cranes and MPM segments to continue, which will drive a higher portion of our net sales and income for the balance of 2008.
>
> * * *
>
> Our global and product diversification has allowed the Company to perform well despite the difficult economic conditions in the U.S., softening of the markets in Western Europe and increasing input costs. Demand remains strong for many of our products, and we are continuing to invest in our business for today and tomorrow, particularly in developing markets such as China and India. We expect world demand for infrastructure, energy and mining products to continue, while at the same time we are positioning our businesses for the eventual recovery in the U.S. market. *We remain confident in our ability to achieve our previously stated goal of '12 by 12 in 10', which is $12 billion in revenues with a 12% operating margin by 2010.* By quickly adapting to changing market conditions in all of our segments and geographies, we are showing that we can provide products that meet our customers' needs worldwide, and at the same time improve our financial performance and invest in growth for the Company.

63.     On July 24, 2008, Terex held an earnings conference call for its first quarter fiscal 2008 financial results. Defendants DeFeo, Widman, and Riordan, along with non-defendants Ford, Nichols, and Eric Nielsen ("Nielsen"), conducted the conference call.

64.     In the conference call, defendant DeFeo stated that he continues to "see strength in several of our businesses" and that the "Terex portfolio is sufficiently diverse to balance a wide variety of change in any individual segment with offsetting effects in other segments." Defendant DeFeo went on to state that the Company was "committed" to its share repurchase program because the Company has "solid cash flow" that will "continue," the Company has "grown [their] earnings meaningfully," the "balance sheet is very strong," and the "stock price is way down."

65.     Defendant Widman affirmed the Company's earnings guidance. Defendant Widman stated:

> Considering our strong year-to-date performance, the challenges and opportunities in some of our end markets, the anticipated input cost pressures and our response to these factors, we are maintaining our full year 2008 guidance with an up sales level of $10.5 billion to $10.9 billion, and earnings per share of $6.85 to $7.15.

66.     Defendant Widman went on to state that the Company's Construction business would "continue to be strong" in Eastern Europe, Middle East, Africa, Russian, and other areas.

67.     Also, in the conference call, defendant DeFeo described the rationale for its stock repurchase. Defendant DeFeo stated that "[w]e look at a dollar of investment from a balance sheet that is fairly under-levered, and we looked at our own equity and feel that buying our own equity is a good investment. And given where the stock is and has been trading, that continues to be how we feel." The false and misleading statements and the repurchase of the Company's shares contributed to the artificial inflation of the Company stock designed to mislead the public into believing the Company's stock was "a good investment."

68.     The second quarter 2008 statements were false and misleading because the Individual Defendants knowingly or recklessly provided earnings guidance that was not achievable based on market conditions they claimed would not significantly impact Terex. The Company's ability to

meet its earnings was also subject to substantial undisclosed risks that customers would cancel and defer orders.

## THE TRUTH BEGINS TO EMERGE

69. On September 4, 2008, Terex issued a press release that announced that it was updating its guidance for the 2008 fiscal year and remaining quarters of fiscal 2008. The guidance revision was required "due to changing market conditions." However, the Individual Defendants knew or were reckless in not knowing that the economic climate had already shifted while the Company was reaffirming their guidance and repurchasing Company stock at artificially inflated prices. The press release stated:

> *Full year 2008 earnings per share are expected to be between $6.35 and $6.65* compared to $5.85 for the full year 2007, a 9% to 14% increase. *Net sales for 2008 are expected to be in the range of $10.2 to $10.6 billion.* This guidance compares to the previously announced range for 2008 earnings per share of $6.85 to $7.15 and net sales of $10.5 to $10.9 billion.
>
> Earnings per share are expected to be between $1.26 and $1.38 for the third quarter of 2008 and between $1.20 and $1.33 in the fourth quarter of 2008. This outlook reflects an effective tax rate of approximately 33% and the continued benefit of reduced share count from the Company's share repurchase program. All per share amounts are on a fully diluted basis.

70. On February 20, 2008, the Company provided guidance of earnings per share between $6.65 and $7.15 and net sales $10.0 and $10.5 billion. On April 23, 2008, the Company increased its guidance for 2008 to $6.85 to $7.15 per share, on net sales of $10.5 to $10.9 billion. The Company reaffirmed its guidance on July 23, 2008. On September 4, 2008, less than two months after reaffirming its guidance, the Company lowered its fiscal 2008 guidance to between $6.35 and $6.65 per share.

71. In a conference call with analysts on September 4, 2008, defendant DeFeo stated that the lowering of guidance was related to the "softness in our Aerial Work Platform business and in our Construction business." While the Company lowered its guidance, defendant Widman continued to play up the strength of the Company. He used the Company's revenue and increased capacity

from other sectors to make false and misleading statements that the Company would not be severely impacted by the economic downturn. Defendant Widman stated:

> *We reduced our overall sales guidance approximately $300 million in total. What's interesting though, is that our significant benefit we receive in Cranes and the Mining business. We talk about this mix in our portfolio. Cranes demand is booming. It continues to boom.* Significant profitability coming from that. Mining activity, significant opportunity, continuing to grow. You'll see the segment discussions today related to those, and why they should continue to grow.

72.     Defendant DeFeo falsely reassured the market that the Company's lowered guidance was conservative and that they "wanted to get the communication out in a way that would be helpful as to opposed to waiting...." Defendant DeFeo stated:

> I think to be sitting here with a 635 to 665 range, $0.30 is still a pretty wide range with four months left to go in the year, *which means that what we're doing, in part, is trying to provide you with early information about how we see the company. But we also wanted to get the communication out in a way that would be helpful as opposed to waiting at the end of September and into early October to see just how we did.*
>
> Because we didn't think that would be a healthy thing either. *Better to deal with our issues today, when we can answer your questions and give you a sense of what's happening in the company, rather than hide from the issues or try to do it on the conference call.* So you're right, there is some difficulty in matching up all the pieces because of what did we buy and share repurchase etcetera.
>
> But what we're trying to do is give you the best indications we can as to the health of the business at this point in time, recognizing that one of the most challenging things a management team has to do in an industry like ours is to handicap the inflection points. Just like one of the most challenging things you have to do is handicap the inflection points. Because the inflection points are always clear in the rearview mirror. And you always know they're in front of you, you just don't know exactly at what point. And that's the real challenge for a management team. Back here.

73.     However, the Company did not "deal with [its] issues today." The Individual Defendants continued to put off disclosing the true business prospects of the Company for months.

74.     On October 22, 2008, Terex issued an earnings press release announcing its results for its fiscal third quarter 2008. In the press release, the Company announced it did not beat its estimates from only weeks before. The Company announced "net income for the third quarter of 2008 of $93.8 million, or $0.96 per share." These earnings are in stark contrast to the earnings

guidance provided on September 4, 2008, which predicted "[e]arnings per share are expected to be between $1.26 and $1.38 for the third quarter of 2008." Defendant DeFeo only let the material information trickle out to the public.

75.     Also, in the press release defendant Widman stated:

Given that external access to credit remains uncertain, we must focus on our cash management. The adjustments to production levels and curtailment of incoming material in the AWP, Construction and Materials Processing businesses are expected to reduce inventory levels, and we will carefully manage incoming material in Cranes and Mining to match the growth expectations of these businesses. We are delaying certain capital spending projects and are not currently purchasing shares under our previously announced share repurchase program. *However, during the third quarter, we repurchased approximately $200 million, or 4.2 million shares, and we remain committed to the share repurchase program when access to the capital markets is clearer.*

76.     The Company once again revised its guidance and lowered its fourth quarter and full year financial results. The press release stated:

*The Company is revising its estimated fourth quarter 2008 earnings per share guidance to reflect changing market conditions, mainly in North America and Western Europe for the AWP and Construction segments, to between $0.80 and $0.90, resulting in full year 2008 earnings per share guidance between $5.69 and $5.79.* Corresponding full year 2008 net sales are expected to be between $10.0 and $10.3 billion. These estimates include a total of $0.12 per share in charges through the third quarter 2008 for the crane repair program and headcount reductions. The full year 2008 guidance does not include additional charges that may be required to implement further cost reduction activities. Management's previous earnings per share guidance for the fourth quarter was between $1.20 and $1.33 and full year 2008 earnings per share guidance was between $6.35 and $6.65.

77.     The Company had significant decreases in its Aerial Work Platforms and Construction segments due to the economy. These unexpected decreases occurred even though defendants assured the public that any decreases would be offset by strength in the Company's other segments. Even with the economic downturn and the decrease in backlog, in the Company's October 23, 2008 conference call, defendant Riordan stated that "we remain optimistic in the medium-term outlook."

78.     On February 3, 2009, Terex again lowered its earnings guidance for fiscal 2008. This earnings revision demonstrates a continual pattern of a failure to accurately provide guidance. The

press release stated that the Company "expects its earnings for 2008 to be approximately 5% below the low end of its previous full year guidance of between $5.69 and $5.79 per fully diluted share. This revised guidance excludes charges associated with the reduction of our production levels." The press release also disclosed that the Company expected to record a goodwill impairment charge of approximately $600 million. Defendant DeFeo stated:

> Our fourth quarter 2008 results were affected by the rapid change in global economic conditions more than we anticipated, as well as continued input cost pressure. We continue to feel the negative effect that credit availability has on customer sentiment and demand for our products, particularly in our Construction, Materials Processing and Aerial Work Platforms businesses, as well as our smaller crane and tower crane product lines.

79.     On February 11, 2009, Terex issued an earnings press release announcing its results for its fiscal fourth quarter 2008 and full year 2008. The press release once again demonstrated the inability to accurately provide earnings guidance. The Company reported a loss of $4.46 per share on the quarter. This loss was a far cry from the $0.80 and $0.90 per share guidance provided on October 22, 2008. Moreover, the full year 2008 results were well below the guidance also provided on October 22, 2008. The press release stated:

> For the full year 2008, the Company reported net income of $71.9 million, or $0.72 per share, compared to net income of $613.9 million, or $5.85 per share, for the full year 2007. The goodwill impairment charges mentioned above reduced net income by $4.60 per share for the full year, and other pre-tax charges totaling $25.8 million, primarily related to adjustment of the Company's production levels, decreased full year 2008 net income by $0.18 per share.

80.     Also, in the press release, defendant DeFeo stated:

> This past year has been like no other – the first half of the year exhibited robust growth and expansion, while the second half of the year was severely impacted by the global credit crisis and economic deterioration, which drove significant declines in customer demand in our businesses. For the full year, net sales increased significantly in our Cranes and Mining businesses, but were offset by the results in our Aerial Work Platforms, Construction, and Materials Processing businesses, which experienced considerable weakness in the second half of the year. Excluding the goodwill impairment charges, our net income for the year was good given the economic environment. Although we are disappointed with our current working capital levels, we have taken aggressive actions to adjust our production to meet reduced customer demand. We maintained a strong cash position and ended the year with a solid balance sheet and sufficient liquidity to execute our key business plans.

Given the current market conditions, it is difficult to project 2009 performance with a reasonable degree of certainty. However, we are planning for continued softness in demand. We are experiencing increasing levels of cancellations in our backlog for crane and mining products, as well as delays in acceptance of deliveries, as our customers in these areas are not immune to the effects of the global economic downturn. ***Based on what we know today, we expect our net sales for 2009 to decline by 30% to 35% from 2008. The translation effect of foreign currency exchange rate changes is expected to contribute approximately 13% of this decline. Given the uncertainty and volatility in today's environment, we are not providing earnings guidance until we have better visibility; however, we will continue to take aggressive actions to reduce operating costs and improve our cash flow.***

81.     The Individual Defendants knew or were reckless in not knowing that the Company's customers would be forced to cancel orders and defer purchases due to the economy. The Individual Defendants continually delayed providing accurate guidance and revealing the Company's true prospects the public. The reason the Company provided for the earnings miss was that "[d]uring the fourth quarter, the Company also experienced softening demand and cancellations and rescheduling of orders in the Cranes and Mining businesses, as the Company confirmed delivery expectations for production in 2009." The press release went on to state "[a] significant portion of these orders were cancelled during the fourth quarter of 2008 due to customer uncertainty regarding the global economic crisis."

82.     The press release also discussed the troubled Construction and Roadbuilding, Utility Products and Other segments of the business. The press release stated:

Construction: Net sales for the Construction segment for the fourth quarter of 2008 decreased $202.2 million, or 37.0%, to $343.9 million versus the fourth quarter of 2007. Excluding the translation effect of foreign currency exchange rate changes and acquisition related net sales during the fourth quarter of 2008, net sales decreased approximately 34% versus the prior year period. Weakness in Western Europe that developed very quickly during the third quarter of 2008 and continued into the fourth quarter was the primary driver of lower net sales. Demand for construction equipment remained soft as residential and non-residential construction experienced increasing weakness globally.

In the fourth quarter of 2008, Construction experienced an operating loss of $66.8 million, excluding impairment charges of $364.4 million, as compared to operating income of $12.5 million for the comparable period in 2007. Lower volume and, to a lesser extent, higher input costs, mainly steel, and costs associated with reductions in production levels, primarily drove the decrease as compared to the fourth quarter of 2007.

* * *

Roadbuilding, Utility Products and Other: Net sales for the RBUO segment for the fourth quarter of 2008 increased $2.8 million, or 1.6%, to $182.1 million versus the fourth quarter of 2007. Excluding the translation effect of foreign currency exchange rate changes and acquisitions, net sales increased approximately 4%. Sales of utility products increased modestly during the fourth quarter of 2008 versus the comparable period in 2007, and increased net sales of roadbuilding equipment manufactured in Latin America more than offset weaker concrete mixer truck sales and softer sales of roadbuilding equipment in North America.

Operating income for the fourth quarter of 2008, excluding impairment charges of $95.5 million, was $0.4 million, an improvement compared to the operating loss of $4.7 million for the comparable period in 2007. Operating income in the fourth quarter of 2008 benefitted from cost reductions implemented earlier in the year, and was partially offset by costs associated with a reduction in production levels. During the fourth quarter of 2007, the winding down of the Company's re-rental business negatively impacted operating profit by approximately $2 million.

Effective January 1, 2009, the Roadbuilding businesses will be consolidated within the Construction segment, the Utility Products businesses will be consolidated within the AWP segment and the RBUO segment will cease to be a reportable segment.

83.     The next day, February 12, 2009, defendants DeFeo, Widman, and Riordan, and non-defendants Nichols, Nielsen, Ford, and, Laura Kiernan held an earnings conference call. On the conference call, defendant DeFeo confirmed that the Company goal of $12 billion in net sales with 12% margins by 2010 "will not be achieved."

84.     With regard to cancellations and deferrals, defendant Riordan confirmed that "[m]ost of our businesses are experiencing continued reductions in incoming orders with the *orders in the backlog being canceled or deferred*." Additionally, the executives on the conference call were challenged by an analyst on how strong the Company's backlog was. The following exchanged ensued:

**Meredith Taylor - *Barclays Capital - Analyst***

I'm wondering if you can talk a little bit about the backlog in terms of what you've done so stress test the remaining close to $3 billion backlog, particularly wondering about the Cranes and Mining business? *I mean I know you've talked about cancellations out of this $650 million shadow backlog*, but what is your outlook for these businesses imply with respect to additional cancellations out of the backlog?

**Ron DeFeo - *Terex Corporation - Chairman of the Board, CEO***

Okay Meredith, I'm going to turn that over to first Rick Nichols in our Crane business and Eric Nielsen in our Mining-- for our Mining segment. But before I do *that just to kind of make an overall comment saying that we have seen cancellations in both of these backlogs but I think both businesses have been very aggressively going after each and every one of the orders to insure that they are solid orders.* So I think as we sit here today, we have a reasonable degree of confidence in the backlogs. Rick.

**Rick Nichols - *Terex Corporation - President of Terex Cranes***

Yes, Meredith. I think from a Cranes perspective, certainly we're flat year-on-year but we have seen significant decline in our tower crane which is down close to 70% from a backlog standpoint. Some weakening in the rough terrain crane business and certainly truck cranes are difficult at this time. But to really offset that we are out aggressively working with our customers and our dealers to insure and understand that the backlog is solid, insuring that they have financing and financing capability and helping them get that if they don't to shore up the backlog.

85.     On February 27, 2009, the Company filed its Form 10-K with the SEC. The Company disclosed that it had performed its annual impairment test for its goodwill on October 1, 2008. The Company determined it would have to take an impairment charge of $459.9 million. This impairment charge represented all "the goodwill recorded in the Construction and [Roadbuilding, Utility, and Other] segments." The Company carried this goodwill on its books and waited until its annual test rather than performing an interim goodwill check as the Company's earnings guidance was lowered and general economic conditions deteriorated.

## REASONS THE STATEMENTS WERE FALSE AND MISLEADING

86.     The false and misleading statements, described above, failed to disclose that the global economic slowdown and recession would impact the Company, which the Individual Defendants knew, consciously disregarded, or were reckless and grossly negligent in not knowing.

## THE STOCK REPURCHASE

87.     In December 2007, the Board authorized a $500 million repurchase of the Company's stock. In July of 2008, defendants DeFeo, Andersen, Jacobs, Sachs, Fike, DeFosset, Wehmeier, Cholmondeley, Shaffer, Hansen, and Wang authorized an additional repurchase of $500 million of Company stock by Terex in the open market. Under these repurchase authorizations, the Company

repurchased more than $391 million of its own common stock from February 2008 through August 2008. The Company's repurchase of its own stock downplayed its exposure to the economy and improperly suggested that the Company expected continued growth and would meet its earnings guidance.

88.     While providing its false and misleading earnings guidance and business prospects, the Company was repurchasing its own stock. The following were the average prices paid for the Company's common stock during the buyback:

| Period | Repurchased Shares | Average Price Per Share |
|---|---|---|
| February 2008 | 112,100 | $68.70 |
| March 2008 | 696,550 | $63.48 |
| April 2008 | 439,900 | $67.87 |
| May 2008 | 235,648 | $71.88 |
| June 2008 | 1,721,730 | $56.24 |
| July 2008 | 2,127,783 | $47.00 |
| August 2008 | 2,007,875 | $47.92 |
| | 7,341,586 | Average: $53.36 |

89.     The average prices above were substantially higher than Terex's share price when its true business health was revealed, dropping Terex's stock price to $9.45 on February 12, 2009. Since that time, the stock price of Terex continued to fall, falling to an all time low of $7.34 only three weeks later.

90.     The stock repurchases falsely signaled to Terex's shareholders and the public that the purchase of the Company's stock at those prices was the best use of Terex's cash. In reality, however, Terex's stock price was inflated as a result of the false and misleading statements regarding the Company's earnings guidance.

**DAMAGES TO TEREX CAUSED BY THE INDIVIDUAL DEFENDANTS**

91.     As a result of the Individual Defendants' improprieties, Terex disseminated false and misleading statements concerning the accuracy of its earnings guidance and business prospects. When the truth about the Company's business prospects were disclosed, Terex market capitalization

was devastated, declining by over $6.6 billion, or 87%, from its high of $7.5 billion on May 6, 2008, the highest price during the time of the false and misleading statements and misleading stock repurchase that inflated the Company's stock price.

92.     Further, as a direct and proximate result of the Individual Defendants' action, Terex has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

(a)     $391 million spent to repurchase Terex's stock at artificially inflated prices;

(b)     costs incurred in investigating and defending Terex and certain officers in class action lawsuits filed against the Company, plus potentially hundreds of millions of dollars in settlement or to satisfy an adverse judgment; and

(c)     costs incurred from compensation and benefits paid to the defendants who have breached their duties to Terex.

93.     Moreover, these actions have irreparably damaged Terex's corporate image and goodwill.  For at least the foreseeable future, Terex will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Terex's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## INSIDER SALES

94.     While defendants DeFeo, Riordan, and Widman were making false and misleading statements about the Company's earnings guidance and business prospects, certain directors and executive officers sold over $6 million of their Company stock.  In their roles as executive officers and directors of Terex, defendants Andersen and Jacobs, as well as four other high ranking officers, (Kevin A. Barr ("Barr"), Terex's Senior Vice President of Human Resources, Filipov, Nichols, and Hyeryun Lee Park ("Park"), Terex's former President of Terex Asia) had access to material non-public information about the Company's earnings guidance and business prospects.  Between February 22, 2008 and August 27, 2008, these individuals sold 92,139 shares of Terex stock for

proceeds of $6,105,401.88. These sales occurred while the Company's stock was artificially inflated due to the false and misleading statements and stock repurchases and authorization

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

95.     Plaintiff brings this action derivatively in the right and for the benefit of Terex to redress injuries suffered, and to be suffered, by Terex as a direct result of violations of Rule 10b and §20(a) of the Exchange Act, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment by the Individual Defendants.  Terex is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

96.     Plaintiff will adequately and fairly represent the interests of Terex in enforcing and prosecuting its rights.

97.     Plaintiff Peter Derrer was a shareholder of Terex at the time of the continuing wrong complained of.  The continuing wrong included the issuance of false and misleading statements regarding Terex's earnings guidance and business prospects, as well as the improper repurchases of Terex's share, which artificially inflated Terex's stock price during February 2008 through February 2009.  Once plaintiff became a shareholder, he has continuously been a shareholder.

98.     The current Board of Terex consists of the following eleven individuals: defendants DeFeo, Andersen, Jacobs, Sachs, Fike, DeFosset, Wehmeier, Cholmondeley, Shaffer, Hansen, and Wang.

99.     Defendant DeFeo made false and misleading statements regarding the Company's earnings guidance and business prospects while causing the Company to repurchase its own stock. As such, he violated section 10(b) of the Exchange Act.  Defendant DeFeo faces a substantial likelihood of liability for his violation of §10(b) of the Exchange Act.  Demand is futile as to defendant DeFeo.

100.    Defendants Jacobs, Sachs, DeFosset, Wehmeier, Cholmondeley, and Shaffer face a substantial likelihood of liability for their violations of §20(a) of the Exchange Act.  Defendants Jacobs, Sachs, DeFosset, Wehmeier, Cholmondeley, and Shaffer each had the power and/or ability

to, and did, directly or indirectly, control or influence defendants DeFeo, Riordan, and Widman in connection with the corporate policies and conduct of defendants DeFeo, Riordan, and Widman that violated §10(b) of the Exchange Act and Rule 10b-5. The Audit Committee's Charter provides that it is responsible for reviewing and discussing information presented in the Company's earnings press releases and other information provided to analysts and rating agencies, including the Company's earnings guidance. As such, defendants Jacobs, Sachs, DeFosset, Wehmeier, Cholmondeley, and Shaffer controlled the earnings press releases content and earnings guidance that were disseminated by Terex, and had the power and/or ability directly or indirectly to control or influence defendants DeFeo, as Terex's CEO, Riordan, as Terex's President and COO, and Widman, as Terex's CFO. Accordingly, defendants DeFeo, Riordan, and Widman are jointly and severally liable under §20(a) of the Exchange Act to the same extent as defendants DeFeo, Riordan, and Widman. As such, defendants Jacobs, Sachs, DeFosset, Wehmeier, Cholmondeley, and Shaffer face a substantial likelihood of liability for their violations of §20(a) of the Exchange Act. Demand is futile as to defendants Jacobs, Sachs, DeFosset, Wehmeier, Cholmondeley, and Shaffer.

101. During July of 2008, while Terex defendants DeFeo, Riordan, and Widman were making false and misleading statements about the Company's earnings guidance and business prospects, defendants DeFeo, Andersen, Jacobs, Sachs, Fike, DeFosset, Wehmeier, Cholmondeley, Shaffer, Hansen, and Wang authorized the repurchase of $500 million worth of Terex shares. Under this authorization and prior authorizations, Terex spent over $391 million while defendants DeFeo, Riordan, and Widman made false and misleading statements inflating the Company's stock price. Further, these defendants failed to halt the repurchases once they knew the Company would not be able to meet its earnings guidance. The decisions to authorize the stock repurchase during July 2008 and the decision to not halt the repurchases were not the product of valid business judgment. Demand is futile as to defendants DeFeo, Andersen, Jacobs, Sachs, Fike, DeFosset, Wehmeier, Cholmondeley, Shaffer, Hansen, and Wang.

102. The Audit Committee Defendants, defendants Jacobs, Sachs, DeFosset, Wehmeier, Cholmondeley, and Shaffer were members of the Audit Committee. The Audit Committee's Charter

provides that it is responsible for reviewing and discussing information presented in the Company's earnings press releases and other information provided to analysts and rating agencies, including the Company's earnings guidance. Thus, the Audit Committee Defendants were responsible for overseeing and directly participating in the dissemination of Terex's false and misleading press releases and conference calls that disseminated false and misleading statements. Despite their knowledge, the Audit Committee Defendants approved the dissemination of the false and misleading statements alleged above. Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty and good faith because they participated in the preparation of earnings press releases that contained false and misleading material information. Thus, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

103. The principal professional occupation of defendant DeFeo is his employment with Terex, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits as alleged above. Specifically Terex paid defendant DeFeo the following compensation:

| Fiscal Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Increase in Pension Value | All Other Compensation |
|---|---|---|---|---|---|---|---|
| 2008 | $1,150,000 | - | $8,460,358 | - | - | $1,374,573 | $809,827 |
| 2007 | $1,025,000 | $110,000 | $10,596,912 | $166,200 | $2,397,713 | $1,585,928 | $313,733 |

Accordingly, defendant DeFeo lacks independence from the remaining Director Defendants due to his interest in maintaining his executive positions at Terex. This lack of independence renders defendant DeFeo incapable of impartially considering a demand to commence and vigorously prosecute this action.

104. Moreover, the acts complained of constitute violations of the fiduciary duties owed by Terex's officers and directors and these acts are incapable of ratification.

105. Each of the defendant directors of Terex authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were

made available and distributed to shareholders, authorized and/or permitted the issuance of various of the false and misleading statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them.

106. Any suit by the current directors of Terex to remedy these wrongs would likely expose the Individual Defendants and Terex to further violations of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

107. Terex has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Terex any part of the damages Terex suffered and will suffer thereby.

108. If Terex's current and past officers and directors are protected against personal liability for their acts of mismanagement and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Terex. However, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by Terex against these defendants, known as the "insured versus insured eclusion." As a result, if these directors were to cause Terex to sue themselves or certain of the officers of Terex, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. If there is no directors' and officers' liability insurance, then the current directors will not cause Terex to sue the defendants named herein, since they will face a large uninsured liability and lose the ability to recover for the Company from the insurance.

109. Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for Terex for any of the wrongdoing alleged by plaintiff herein.

110. Plaintiff has not made any demand on the shareholders of Terex to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a) Terex is a publicly held company with over 108 million shares outstanding and thousands of shareholders;

(b) making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders; and

(c) making demand on all shareholders would force plaintiff to incur excessive expenses, assuming all shareholders could be individually identified.

## COUNT I

**Derivatively Against Defendants DeFeo, Riordan, and Widman for Violation of §10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder**

111. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

112. The wrongful conduct alleged regarding the issuance of false and misleading statements, during February 2008 through February 2009, was continuous, connected, and was on-going throughout the applicable time period. It resulted in continuous, connected, and on-going harm to the Company.

113. As alleged above, during 2008 and 2009, defendants DeFeo, Riordan, and Widman knowingly or recklessly made and caused the publication of false and misleading statements regarding Terex's earnings guidance and business prospects, and knowingly, willfully, and acting with scienter, caused Terex to repurchase 7,341,586 shares of its own stock on the open market at a weighted average price of $53.36 per share, for a total cost to Terex of $391 million, when they knew that Terex's stock price was artificially inflated due to their misleading statements. The false

statements and repurchases of Terex stock were intended to and did manipulate and/or deceive Terex and its shareholders.

114.    Defendants DeFeo, Riordan, and Widman thereby violated §10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

(a)    employed devices, schemes, and artifices to defraud Terex;

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c)    engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Terex in connection with the purchases of Terex common stock.

115.    As a direct and proximate result of the wrongful conduct of defendants DeFeo, Riordan, and Widman, Terex has and will suffer damages in connection with its purchases of Terex common stock at prices that defendant DeFeo, Riordan, and Widman knew to be artificially inflated.

116.    But for the misconduct of defendants DeFeo, Riordan, and Widman, Terex would not have repurchased its stock at artificially inflated prices. Terex reasonably relied on the diligence, loyalty, and good faith of defendants DeFeo, Riordan, and Widman in repurchasing its stock.

117.    Defendants DeFeo, Riordan, and Widman's conduct proximately caused Terex's loss. Terex's stock price fell in a series of drops following the publication of disclosures that revealed the truth about Terex's earnings guidance and business prospects. After Terex's true prospects and financial condition were fully revealed, Terex's shares ultimately fell to $9.45 per share on February 12, 2009.

118.    Defendant DeFeo, Riordan, and Widman are therefore liable to Terex for damages in an amount to be determined at trial pursuant to §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

## COUNT II

### Derivatively Against the Audit Committee Defendants for Violation of §20(a) of the Exchange Act

119. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

120. The wrongful conduct alleged regarding the issuance of false and misleading statements, during February 2008 through February 2009, was continuous, connected, and was ongoing throughout the applicable time period. It likewise resulted in continuous, connected, and ongoing harm to the Company.

121. The Audit Committee Defendants, defendants Jacobs, Sachs, DeFosset, Wehmeier, Cholmondeley, and Shaffer, as directors and as members of the Audit Committee, had the power and/or ability to, and did, directly or indirectly control or influence the Company's general affairs, including the controlling earnings press releases content and information disclosed during earnings conference calls that were disseminated by Terex, and had the power and/or ability directly or indirectly to control or influence defendants DeFeo, as Terex's CEO, Riordan, as Terex's President and COO, and Widman, as Terex's CFO, in connection with the specific corporate policies and conduct that violated §10(b) of the Exchange Act and SEC Rule 10b-5 as alleged above.

122. Defendants Jacobs, Sachs, DeFosset, Wehmeier, Cholmondeley, and Shaffer did not act in good faith in regard to these allegations. They are jointly and severally liable under §20(a) of the Exchange Act to the same extent as defendants DeFeo, Riordan, and Widman for the primary violations of §10(b) and Rule 10b-5 promulgated thereunder, as set forth herein.

## COUNT III

### Against Defendants DeFeo, Riordan, and Widman for Breach of Fiduciary Duties of Due Care, Loyalty and Good Faith for Dissemination of False and Misleading Statements

123. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

124. The wrongful conduct alleged regarding the issuance of false and misleading statements, during February 2008 through February 2009, was continuous, connected, and was on-

going throughout the applicable time period. It resulted in continuous, connected, and on-going harm to the Company.

125. Defendants DeFeo, Riordan, and Widman owed and owe Terex fiduciary obligations. By reason of their fiduciary relationships, DeFeo, Riordan, and Widman owed and owe Terex the highest obligation of due care, loyalty and good faith.

126. Defendants DeFeo, Riordan, and Widman violated and breached their fiduciary duties of care, loyalty and good faith by negligently, knowingly, or recklessly making false statements regarding Terex's earnings guidance and business prospects. These statements were false and misleading, however, because, as defendants DeFeo, Riordan, and Widman knew or were reckless or negligent in not knowing, Terex faced a substantial risk of not meeting its earnings guidance. DeFeo, Riordan, and Widman's false statements were included in earnings press releases and in conference calls hosted for investors and analysts.

127. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

128. As a direct and proximate result defendants DeFeo, Riordan, and Widman's failure to perform their fiduciary obligations, Terex has sustained significant damages. As a result of the misconduct alleged herein, defendants DeFeo, Riordan, and Widman are liable to the Company.

## COUNT IV

### Against the Audit Committee Defendants for Breach of Fiduciary Duties of Loyalty and Good Faith for Dissemination of False and Misleading Statements

129. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

130. The wrongful conduct alleged regarding the issuance of false and misleading statements, during February 2008 through February 2009, was continuous, connected, and was on-going throughout the applicable time period. It resulted in continuous, connected, and on-going harm to the Company.

131. The Audit Committee Defendants, defendants Jacobs, Sachs, DeFosset, Wehmeier,

Cholmondeley, and Shaffer, owed and owe Terex fiduciary obligations. Additionally, the Audit Committee Defendants owed specific duties under the Audit Committee Charter in effect during February 2008 through February 2009 to Terex to review and discuss Terex's earnings press releases and statements made in conference calls. By reason of their fiduciary relationships, these defendants owed and owe Terex the highest obligation of loyalty, fair dealing, and good faith.

132. The Audit Committee Defendants violated and breached their fiduciary duties of loyalty, reasonable inquiry, oversight, good faith, and supervision by knowingly or recklessly reviewing and approving false statements included in Terex's earnings press releases and made during conference calls to analysts and investors. These statements were false and misleading, however, because Terex faced a substantial risk of not meeting its earnings guidance due to the economic downturn.

133. The Audit Committee Defendants' wrongful conduct could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

134. As a direct and proximate result of the Audit Committee Defendants' failure to perform their fiduciary obligations, Terex has sustained significant damages. As a result of the misconduct alleged herein, the Audit Committee Defendants are liable to the Company.

### COUNT V

**Against Director Defendants for Breach of the Fiduciary Duties of Loyalty and Good Faith for Authorizing and Failing to Halt the Company's Stock Repurchases**

135. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

136. The wrongful conduct alleged regarding the issuance of false and misleading statements, during February 2008 through February 2009, was continuous, connected, and was on-going throughout the applicable time period. It resulted in continuous, connected, and on-going harm to the Company.

137. The Director Defendants owed and owe Terex fiduciary obligations. By reason of their fiduciary relationships, these defendants owed and owe Terex the highest obligation of loyalty,

fair dealing, and good faith.

138.    The Director Defendants violated and breached their fiduciary duties of loyalty, reasonable inquiry, oversight, good faith, and supervision by knowingly or recklessly authorizing and failing to halt the repurchase of shares while Terex's share price was artificially inflated as a result of false and misleading statements regarding the Terex's earnings guidance and business prospects. While Terex stock was artificially inflated, Terex repurchased 7,341,586 million shares of its own stock, for a total cost of more than $391 million.

139.    The Director Defendants' wrongful conduct could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

140.    As a direct and proximate result of Director Defendants' failure to perform their fiduciary obligations, Terex has sustained significant damages. As a result of the misconduct alleged herein, these defendants are liable to the Company.

## COUNT VI

### Against All Defendants for Waste of Corporate Assets

141.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

142.    The wrongful conduct alleged regarding the issuance of false and misleading statements, during February 2008 through February 2009, was continuous, connected, and was on-going throughout the applicable time period. It resulted in continuous, connected, and on-going harm to the Company.

143.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by: (i) directing Terex to repurchase over $391 million of its own stock at artificially inflated prices; (ii) by paying bonuses to certain of its executive officers; and (iii) incurring potentially hundreds of millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

144.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

145.    Plaintiff, on behalf of Terex, has no adequate remedy at law.

## COUNT VII

### Against All Defendants for Unjust Enrichment

146.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

147.    The wrongful conduct alleged regarding the issuance of false and misleading statements, during February 2008 through February 2009, was continuous, connected, and was on-going throughout the applicable time period. It resulted in continuous, connected, and on-going harm to the Company.

148.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Terex. The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Terex.

149.    Plaintiff, as a shareholder and representative of Terex, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

150.    Plaintiff, on behalf of Terex, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands for a judgment as follows:

A.     Declaring that defendants DeFeo, Riordan, Widman are liable under §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder, and that the Audit Committee Defendants, Andersen, Fike, Hansen, and Wang are jointly and severally liable under §20(a) of the Exchange Act, and awarding Terex damages on these counts;

B.     Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

C.     Directing Terex to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Terex and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

1.     a proposal to strengthen the Company's internal controls over the Company's financial reporting and statements;

2.     a proposal to strengthen the Board's supervision of major accounting decisions and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

3.     a provision to permit the shareholders of Terex to nominate at least three candidates for election to the Board;

D.     Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting defendants' assets so as to assure that plaintiff on behalf of Terex has an effective remedy;

E.     Awarding to Terex restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

F.     Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.


DATED: April 6, 2010

LAW OFFICES OF DAVID RUBIN
DAVID RUBIN

DAVID RUBIN (CT-10169)
600 Summer Street, Suite 201
Stamford, CT 06905
Telephone: (203) 353-1404
Facsimile: (203) 357-7208

ROBBINS UMEDA LLP
BRIAN J. ROBBINS
FELIPE J. ARROYO
ASHLEY R. PALMER
JAY N. RAZZOUK
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

KENDAL LAW GROUP, LLP
HAMILTON LINDLEY
3232 McKinney, Ste. 700
Dallas, TX 75204
Telephone: (214) 744-3000
Facsimile: (214) 744-3015

ATTORNEYS FOR PLAINTIFF

<u>VERIFICATION</u>

I, Peter Derrer, hereby declare as follows:

I am a shareholder of Terex Corporation. I have retained competent counsel and I am ready, willing and able to pursue this action vigorously on behalf of the Company. I have reviewed the Verified Shareholder Derivative Complaint for Violations of the Securities Exchange Act of 1934, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment (the "Complaint"). Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: *March 10 / 2010*

_____
PETER DERRER